

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-1998

# Deane v. Pocono Med Ctr

Precedential or Non-Precedential:

Docket 96-7174

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Deane v. Pocono Med Ctr" (1998). *1998 Decisions.* Paper 81.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/81

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 15, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7174

STACY L. DEANE,
Appellant

v.

POCONO MEDICAL CENTER

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. Action No. 94-1139)

Argued: January 31, 1997

Before: BECKER and ROTH, Circuit Judges,
and BARRY, District Judge.*

Reargued En Banc: January 29, 1998

Before: SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD,
ALITO, ROTH, LEWIS,** McKEE, and RENDELL,
Circuit Judges.

(Filed April 15, 1998)

_____

*Honorable Maryanne Trump Barry, United States District Judge for the
District of New Jersey, sitting by designation.

**Judge Lewis heard argument in this matter but was unable to clear the
opinion due to illness.

DEBRA A. JENSEN, ESQUIRE
(Argued)
DANIEL BENCIVENGA, ESQUIRE
Galfand, Berger, Lurie, Brigham,
Jacobs, Swan, Jurewicz & Jensen,
 LTD.
Suite 2300, 1818 Market Street
Philadelphia, PA 19103-3623
Attorneys for Appellant Stacy L.
Deane

SIDNEY R. STEINBERG, ESQUIRE
(Argued)
Post & Schell, P.C.
1800 JFK Boulevard, 19th Floor
Philadelphia, PA 19103
Attorneys for Appellee
Pocono Medical Center

OPINION OF THE COURT

BECKER, Chief Judge.***

This is an appeal by Stacy L. Deane from an order of the district court granting summary judgment to her former employer, Pocono Medical Center ("PMC"), on Deane's claim under the Americans with Disabilities Act ("ADA" or the "Act"), 42 U.S.C. S 1201 et seq. In enacting the ADA, Congress intended that the scope of the Act would extend not only to those who are actually disabled, but also to individuals wrongly regarded by employers as being disabled. Deane, a registered nurse, sued PMC under the ADA as such a "regarded as" plaintiff to redress PMC's failure to accommodate her in a manner that would enable her to retain her position following a work-related injury that affected her ability to do heavy lifting.1 The case came

_____

***Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.
1. Deane also alleges that PMC improperly terminated her employment in violation of the Rehabilitation Act of 1973, 29 U.S.C. SS 701 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. SS 951 et seq. Those claims are not before us.

2

before the en banc court to settle the question that divided the original panel -- whether "regarded as" plaintiffs, in order to be considered qualified under the ADA, must show that they are able to perform all of the functions of the relevant position or just the essential functions, with or without accommodation. The panel decided that they must be able to perform all of the functions. Before the en banc court, neither party supported that position, and we now reject it, concluding that the plain language of the ADA requires proof only of a plaintiff 's ability to perform a position's essential functions.

This conclusion forces us to determine whether Deane has adduced sufficient evidence to create a genuine issue of material fact with respect to two elements of her prima facie case: (1) whether PMC misperceived Deane as being disabled; and (2) whether Deane is a "qualified individual", a decision that turns on whether lifting is an essential function of nursing at PMC. Because we conclude that Deane has adduced sufficient evidence regarding both of these matters, we hold that summary judgment was inappropriate. Accordingly, the judgment of the district court will be vacated and the case remanded for further proceedings.

The panel addressed a second question of much greater difficulty -- whether "regarded as" plaintiffs must be accommodated by their employers within the meaning of the ADA. It may well be, as two members of the panel concluded, that after the employer is disabused of its improper perception of the individual's disability, there is no reason to afford the individual any special treatment, and hence the employee is not statutorily entitled to accommodation from the employer. However, as resolution of that issue is not necessary to final disposition of this appeal, we will not decide it.

I.

In April 1990, PMC hired Deane as a registered nurse to work primarily on the medical/surgical floor. On June 22, 1991, while lifting a resistant patient, she sustained a cartilage tear in her right wrist causing her to miss

3

approximately one year of work. In June 1992, Deane and Barbara Manges, a nurse assigned to Deane's workers' compensation case, telephoned PMC and advised Charlene McCool, PMC's Benefits Coordinator, that Deane intended to return to work with certain restrictions. According to Deane, she informed McCool that she was unable to lift more than 15-20 pounds or perform repetitive manual tasks such as typing, but that her physician, Dr. Osterman, had released her to return to "light duty" work.[2] Deane further explained to McCool that, if she could not be accommodated in a light duty position on the medical/surgical floor, she was willing to move to another area of the hospital, as long as she could remain in nursing. Unfortunately, this telephone call was PMC's only meaningful interaction with Deane during which it could have assessed the severity of or possible accommodation for her injuries. PMC never requested additional information from Deane or her physicians, and, according to Deane, when she subsequently attempted to contact PMC on several occasions, she was treated rudely by McCool and told not to call again.

After speaking with Deane and Manges, McCool advised Barbara Hann, PMC's Vice President of Human Resources, of Deane's request to return to work, of her attendant work restrictions, and of her stated need for accommodation. Shortly after considering the information conveyed by McCool and after comparing it to the job description of a medical/surgical nurse at PMC, Hann determined that Deane was unable to return to her previous position. Hann then asked Carol Clarke, PMC's Vice President of Nursing, and Susan Stine, PMC's Director of Nursing Resources/

_____

2. In a letter dated June 8, 1992, the contents of which were communicated by Deane and Manges to McCool during their telephone conversation, Dr. Osterman opined as follows:

> I do not think [Deane] can return to unrestricted nursing i.e. I would
> place a lifting limit of 20 pounds and a limit on unrestricted
> repetitive motion of her wrist. She does believe that she can return
> to some nursing and I would agree with this. She has suggested
> pediatric nursing, neonatal nursing and possibly even the cancer
> unit at the hospital which apparently does not involve lifting the
> patients. All would be acceptable.

4

Patient Care Services, to review Deane's request to return to PMC and to explore possible accommodations for her. Both Clarke and Stine concluded that Deane could not be accommodated in her previous job as a nurse on the medical/surgical floor or in any other available position at the hospital. Finally, Hann asked Marie Werkheiser, PMC's Nurse Recruiter, whether there were any current or prospective job openings for registered nurses at PMC. According to Werkheiser, there were no such openings at that time.

As a result of the collective determination that Deane could not be accommodated in her previous job or in any other available position in the hospital, PMC sent Deane an "exit interview" form on August 7, 1992. On August 10, 1992, Hann notified Deane by telephone that she could not return to work because of her "handicap", and this litigation ensued. In March 1993, Deane accepted a registered nurse position at a non-acute care facility, where she remained until May 1993. Deane has been employed by a different non-acute care facility since July 1993. Neither of these positions require heavy lifting, bathing patients, or the like.

Deane argued to the district court that she was both actually disabled as a result of her injury and that she was perceived to be so by PMC. On summary judgment, the court rejected both theories and held that Deane was neither disabled nor regarded by her employer as being disabled and that, even if she were, she failed to meet the statutory definition of a qualified individual with a disability. Deane has not appealed the district court's determination that she was not actually disabled. Indeed, she now concedes that "[i]n light of the decisional trends in this Circuit and others," she is not now and never was disabled and, consequently, that, but for PMC's erroneous perception of her actual impairment, she would have no claim under the ADA.

What is left, then, are Deane's contentions that she was disabled under the terms of the ADA by virtue of the fact that PMC regarded her limitations as being far worse than they actually were, that PMC failed to accommodate her lifting restriction, and that she was eventually terminated

5

on account of PMC's perception that she was disabled. In support of her perception claim, Deane relies on a"laundry list" of PMC's allegedly erroneous perceptions. According to Deane, PMC believed that she was unable to lift more than ten pounds, push or pull anything, assist patients in emergency situations, move or assist patients in the activities of daily living, perform any patient care job at PMC or any other hospital, perform CPR, use the rest of her body to assist patients, work with psychiatric patients, or use medical equipment. Deane refutes each of these perceptions -- or, in her view, misperceptions-- and contends that her injury was, in fact, relatively minor in nature. Deane further contends that PMC should be held responsible for these misperceptions because they were the result of PMC's "snap judgment" arrived at without making a good faith analysis, investigation, or assessment of the nature of her injury.

Finally, Deane maintains that she requires and is entitled to accommodation for her lifting restriction. In this regard, Deane contends that she could be accommodated either in her previous position as a nurse on the medical/surgical floor or through reassignment to another position that would not require heavy lifting. As to the former, Deane has suggested the following accommodations: (1) use of an assistant to help her move or lift patients; (2) implementation of a functional nursing approach, in which nurses would perform only certain types of nursing tasks; and (3) use of a Hoyer lift to move patients. Deane also maintains that she could have been transferred to another unit within the medical center such as the pediatrics, oncology, or nursery units, which would not have required heavy lifting. In the alternative, Deane submits that she can perform the essential functions of her previous job in the medical/surgical floor without accommodation because lifting is not an essential function of nursing. We set forth our jurisdiction and standard of review in the margin.3

_____

3. We have appellate jurisdiction over the district court's grant of summary judgment pursuant to 28 U.S.C. S 1291. Because our standard of review is plenary, see Kelly v. Drexel University, 94 F.3d 102, 104 (3d Cir. 1996), we apply the same test the district court should have applied

6

II.

The core anti-discrimination section of the ADA provides
that:

> No covered entity shall discriminate against a qualified
> individual with a disability because of the disability of
> such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. S 12112. In order to make out a prima facie case
under the ADA, a plaintiff must be able to establish that he
or she (1) has a "disability" (2) is a "qualified individual"
and (3) has suffered an adverse employment action because
of that disability. See Gaul v. Lucent Techs. Inc., 134 F.3d
576, 580 (3d Cir. 1998).

A.

Turning to the first prong of the prima facie  case, we
must determine whether Deane is disabled under the terms
of the Act. The ADA defines a "disability" as:

> (A) a physical or mental impairment that substantially
> limits one or more of the major life activities of such
> individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. S 12102(2); 29 C.F.R. S 1630.2(g).4 Because

_____

in the first instance. See Olson v. General Electric Astrospace, 101 F.3d
947, 951 (3d Cir. 1996); Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir.
1995). We must determine, therefore, whether the record, when viewed
in the light most favorable to Deane, shows that there is no genuine
issue of material fact and that PMC was entitled to summary judgment
as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317,
322-
23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986);
Olson, 101 F.3d at 951.

4. Because the ADA does not define many of the pertinent terms, we are
guided by the Regulations issued by the Equal Employment Opportunity

7

Deane concedes that she is not actually disabled, but that she was only "regarded as" being disabled, we direct our focus to the third tier of the statutory definition. Read in conjunction with the first tier, which defines an actual disability, the third tier requires us to determine whether PMC regarded Deane as having an impairment and whether the impairment, as perceived by PMC, would have substantially limited one or more of Deane's major life activities.5 Deane's actual impairment, therefore, is of no consequence to our analysis.

_____

Commission ("EEOC") to implement Title I of the Act. See 42 U.S.C. S 12116 (requiring the EEOC to implement said Regulations); 29 C.F.R. S 1630.2. Regulations such as these are entitled to substantial deference. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); Blum v. Bacon, 457 U.S. 132, 141 (1982); Helen L. v. DiDario, 46 F.3d 325, 331-32 (3d Cir. 1995).

5. With the "regarded as" prong, Congress chose to extend the protections of the ADA to individuals who have no actual disability. The primary motivation for the inclusion of misperceptions of disabilities in the statutory definition was that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." See 29 C.F.R. pt. 1630, app. S 1630.2(l) (EEOC's "Interpretive Guidance" to the ADA) (citing School Bd. of Nassau County v. Arline, 480 U.S. 273, 284 (1987)).

The limited legislative history also confirms that Congress's primary concern in enacting the "regarded as" prong of the ADA was for individuals with no limitations but who, because of some non-limiting impairment, are prevented from obtaining employment as a result of societal prejudices. As the final House Report provides:

> The rationale for this third test [the "regarded as" prong] as used
> in the Rehabilitation Act of 1973, was articulated by the Supreme
> Court in School Board of Nassau County v. Arline . The Court noted
> that although an individual may have an impairment that does not
> in fact substantially limit a major life activity, the reactions of others
> may prove just as disabling. "Such an impairment might not
> diminish a person's physical or mental capabilities, but could
> nevertheless substantially limit that person's ability to work as a
> result of the negative reactions of others to the impairment."

> The Court concluded that, by including this test, "Congress
> acknowledged that society's accumulated myths and fears about
> disability and diseases are as handicapping as are the physical
> limitations that flow from actual impairment."

H.R. Rep. No. 101-485(III) (1990) at 30, reprinted in, 1990 U.S.C.C.A.N. 445, 453 ("House Judiciary Report") (footnotes omitted).

Turning to the EEOC Regulations, they provide that an individual is "regarded as" being disabled if he or she:

> (1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or

> (3) [h]as none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.[6]

29 C.F.R. S 1630.2(l). See also H.R. Rep. No. 101-485 (II), at 53 (1990) ("House Labor Report"), reprinted in 1990 U.S.C.C.A.N. 303, 335; House Judiciary Report at 29, reprinted in 1990 U.S.C.C.A.N. at 452. Common to each definition is the requirement that the individual not in fact have an impairment that, absent the misperceptions of others, would substantially limit a major life activity.

Deane contends that she satisfies the first definition because PMC erroneously perceived that the nature and extent of her physical impairment "substantially limited" her ability to "work", which is included within the EEOC's definition of a "major life activity".[7] See generally Olson, 101

_____

6. 29 C.F.R. S 1630.2(h) defines "physical or mental impairment" as:

> (1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2) [a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

7. Major life activities include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," see 29 C.F.R. S 1630.2(i), as

F.3d at 953-55; MacDonald v. Delta Airlines, Inc., 94 F.3d 1437, 1445 (10th Cir. 1996); Bridges v. City of Bossier, 94 F.3d 329, 333-34 (5th Cir. 1996). The district court rejected Deane's perceived disability claim on three grounds. First, the court found, as a matter of undisputed fact, that PMC regarded Deane's impairment as limiting only her ability to work as a nurse on the surgical/medical floor, not her ability to work as a nurse in general. Next, the court determined that Deane could not have been generally precluded from working in her field because, following her termination from PMC, she held two positions as a registered nurse. Finally, the court concluded, as a matter of law, that PMC's perception of Deane's impairment was not motivated by "myth, fear or stereotype" and, therefore, was not actionable under the ADA. We disagree with all

_____

well as "sitting, standing, lifting, [and] reaching." 29 C.F.R. pt. 1630, app. S 1630.2(i); House Labor Report at 52, reprinted in 1990 U.S.C.C.A.N. at 334; House Judiciary Report at 28-29, reprinted in 1990 U.S.C.C.A.N. at 451.

Where, as here, the major life activity at issue is working, the term "substantially limited" is defined as "significantly restricted in the ability
to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Olson, 101 F.3d at 952 (citing 29 C.F.R. S 1630.2(j)(3)(i)). Thus, the mere "inability to perform a single, particular
job does not constitute a substantial limitation in the major life activity
of working." Id. In making these determinations, courts may consider:

> (A) [t]he geographical area to which the individual has reasonable
> access;

> (B) [t]he job from which the individual has been disqualified
> because of an impairment, and the number and types of jobs
> utilizing similar training, knowledge, skills or abilities, within
that
> geographical area, from which the individual is also disqualified
> because of the impairment (class of jobs); and/or

> (C) [t]he job from which the individual has been disqualified
> because of an impairment, and the number and types of other jobs
> not utilizing similar training, knowledge, skills or abilities,
within
> that geographical area, from which the individual is also
disqualified
> because of the impairment (broad range of jobs in various classes).

29 C.F.R. S 1630.2(j)(3)(ii).

three of the court's rationales, discussing them in reverse order.

Although the legislative history indicates that Congress was concerned about eliminating society's myths, fears, stereotypes, and prejudices with respect to the disabled, the EEOC's Regulations and Interpretive Guidance make clear that even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability. See 29 C.F.R. pt. 1630, app.S 1630.2(l) (describing, as one example of a "regarded as" disabled employee, an individual with controlled high blood pressure that is not substantially limiting, who nonetheless is reassigned to less strenuous work because of the employer's unsubstantiated fear that the employee will suffer a heart attack). Thus, whether or not PMC was motivated by myth, fear or prejudice is not determinative of Deane's "regarded as" claim.

The second ground -- that Deane's subsequent employment in the field of nursing demonstrated that she was not substantially limited in the major life activity of working -- confuses her actual impairment with PMC's misperception thereof. Deane's subsequent work history could, at most, reflect her lack of an actual disability, and it therefore sheds no light whatever on whether, at the time of her termination, PMC regarded her impairment as substantially limiting her ability to work.

Finally, contrary to the district court's conclusion, Deane has adduced sufficient evidence to create a genuine issue of material fact as to whether PMC regarded her as substantially limited in the major life activity of working. First, there is deposition testimony from PMC officials documenting confusion as to the extent of Deane's physical capacity, with regard to pushing, pulling, and lifting. There is also evidence that PMC fundamentally misunderstood and exaggerated the limitations that the wrist injury imposed on Deane. Moreover, PMC's apparent misunderstanding is in line with other testimony that PMC did not evaluate Deane, contact her physicians, or

11

independently review her medical records, but rather relied solely on one telephone conversation it had with Deane.

Deane also produced the affidavit and report of Daniel Rappucci, her vocational expert, who explained the import of PMC's perception of Deane's injury. Rappucci concluded that, had Deane been impaired to the extent allegedly perceived by PMC, she would have been precluded from consideration for employment, both within her chosen profession and within a wide range of jobs within her geographic region. Rappucci further opined that Deane would have been precluded from performing not only many of the available jobs in service-producing industries, (including transportation, wholesale/retail, finance, real estate, hospitality industries, medical services, and professional services), which made up 83% of the 41,000 non-agricultural jobs in Deane's county of residence, but also most of the jobs in the goods-producing industries (contract construction, mining, and manufacturing), which comprised the remaining 17% of available positions. PMC counters with the argument that it attempted to accommodate Deane by placing her in other light-duty positions when and if they became available, and that this suggests that PMC did not believe Deane to be disabled. PMC submits that its actions indicate only that PMC considered Deane to be incapable of performing certain functions that precluded her from returning to nursing.

As the preceding discussion makes clear, however, there are factual disputes over how impaired PMC regarded Deane as being compared with her actual level of impairment, and whether PMC's perception of Deane constituted a "significant[ ] restrict[ion] in [Deane's] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. S 1630.2(j)(3)(i). Deane has thus adduced sufficient evidence that PMC regarded her as substantially more physically impaired than she actually was, and that PMC's misperception, if correct, would satisfy the S 1630.2(j)(3)(i)

12

threshold. Therefore, summary judgment on this issue was inappropriate.[8]

B.

The second element of Deane's prima facie case under the ADA requires her to demonstrate that she is a "qualified individual". The ADA defines this term as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111(8). The Interpretive Guidance to the EEOC Regulations divides this inquiry into two prongs. First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires. See 29 C.F.R. pt. 1630, app. S 1630.2(m). Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought. See id.; see also Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995). Because PMC does not dispute Deane's general qualifications as a registered nurse, we need not dwell on the first step of the "qualified individual" analysis.

Determining whether an individual can, with or without reasonable accommodation, perform the essential functions of the position held or sought, also a two step process, is relatively straightforward. First, a court must consider whether the individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, a fortiori, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable

_____

8. In a related vein, PMC seems to suggest that there is no causal relationship between the alleged misperception and Deane's discharge in that PMC took Deane's original statement that she could do no lifting and needed major accommodation at face value. Thus, according to PMC, Deane was not discharged because of its misperception. But there is also a genuine issue of fact here as well, see infra Parts II.B.2 and III.

accommodation.9 If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the prima facie case.

_____

9. "In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." 29 C.F.R. pt. 1630, app. S 1630.2(o). The text of the ADA provides that "reasonable accommodation" may include--

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to vacant position, acquisition or modifications of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. S 12111(9) (emphasis added).

The EEOC Regulations further define "reasonable accommodation" to include

> (i) [m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such applicant desires; or

> (ii) [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> (iii) [m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. S 1630.2(o)(1).

An individual's right to reasonable accommodation may be subject, however, to certain limitations. For example, an employer is not required to provide accommodation if it would impose an "undue hardship" on the employer as defined in 29 C.F.R. S 1630.2(p). An employer also is not

required to provide accommodation if the individual poses a "direct threat" to the health or safety of himself/herself or others unless such accommodation would either eliminate such risk or reduce it to an acceptable level. 29 C.F.R. S 1630.2(r).

14

The majority panel opinion, in deciding for PMC, reasoned that to satisfy the first step, a "regarded as" plaintiff must make a showing that he or she could perform all the functions of the job (with or without accommodation), not just its essential functions. PMC disassociated itself from the panel's position before the en banc court. As this issue is one of statutory construction, the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., ___ U.S. ___, 117 S. Ct. 843, 846 (1997).

1.

The ADA prohibits a "covered entity" from discriminating against a "qualified individual with a disability." 42 U.S.C. S 12112(a). Section 12111(8), which defines the latter term, reads:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

Section 12111(8) is plain and unambiguous. The first sentence of that section, makes it clear that the phrase "with or without reasonable accommodation" refers directly to "essential functions". Indeed, there is nothing in the sentence, other than "essential functions", to which "with or without reasonable accommodation" could refer. Moreover, nowhere else in the Act does it state that, to be a "qualified individual", an individual must prove his or her ability to perform all of the functions of the job, and nowhere in the Act does it distinguish between actual or

15

perceived disabilities in terms of the threshold showing of qualifications. Therefore, if an individual can perform the essential functions of the job without accommodation as to those functions, regardless of whether the individual can perform the other functions of the job (with or without accommodation), that individual is qualified under the ADA.

The history of the ADA confirms this view. In the committee reports that accompanied the ADA, Congress spoke directly to the qualifications standard adopted in the statute. Repeatedly, Congress stated that the qualifications standard turned on the individual's ability to perform the "essential functions" of the job. See e.g. , House Labor Report at 55, reprinted in 1990 U.S.C.C.A.N. at 337; House Judiciary Report at 32–33, reprinted in 1990 U.S.C.C.A.N. at 455. Congress explained that the Act focused on an individual's ability to perform "essential functions" to ensure that persons with disabilities "not be disqualified because of the inability to perform non-essential or marginal functions of the job." House Judiciary Report at 31–32, reprinted in 1990 U.S.C.C.A.N. at 454. As stated in one committee report, the purpose of the ADA's qualifications standard is to "ensure that employers can continue to require that all applicants and employees, including those with disabilities, are able to perform the essential functions, i.e., the non-marginal functions of the job in question." House Labor Report at 55, reprinted in 1990 U.S.C.C.A.N. at 337 (emphasis added).

2.

Having rejected the panel's position that Deane needed to make a showing that she can perform all of the functions of her former job, we must now determine whether Deane has, in fact, adduced sufficient evidence to survive summary judgment on the question whether she can perform the essential functions of the job without accommodation as to those functions. Deane claims that the heavy lifting she is restricted from doing is not an essential job function of a nurse. Deane describes nursing as a profession that focusses primarily on skill, intellect, and knowledge. While conceding that lifting constitutes part of a nurse's duties, she submits that it is only a small part.

16

In support of her contentions, Deane again offers Rappucci's affidavit and report. Rappucci opines that patient care, not heavy lifting of patients, is the essential function of registered nursing. As evidence, he references the Department of Labor's Dictionary of Occupational Titles Job Descriptions ("DOL Dictionary"), which details four critical tasks of a general duty nurse, none of which involves heavy lifting: (1) administering medications and treatments, (2) preparing equipment and aiding physicians during the treatment of patients, (3) observing patients and recording significant conditions and reactions to drugs, treatments, and significant incidents, and (4) taking temperature, pulse, blood pressure, and other vital signs to detect deviations from normal and assess the condition of the patient. Rappucci also notes that nursing is a professional occupation, and he compares it with orderly work to exemplify the differences between the two positions. For example, whereas nursing is classified by the Department of Labor as skilled, medium duty labor, orderly work is classified as semi-skilled, heavy-duty labor. Also, whereas none of a general nurse's critical tasks under the DOL Dictionary description include lifting, the description of orderly work enumerates "lift[ing] patients onto and from bed" as critical task number five. This is because, according to Deane, the orderly position exists to assist the nurse professional in the performance of his or her job duties. Finally, Deane points out that, recognizing the difficulty of unassisted heavy lifting, PMC uses a team approach to the lifting of patients, both in routine matters and in responding to emergency situations.10

PMC responds that lifting is an essential function of a nurse. In support, PMC cites its job description, which details under the heading "MAJOR TASKS, DUTIES AND RESPONSIBILITIES" that one of the "WORKING CONDITIONS" for a staff registered nurse is the "[f]requent

_____

10. Rappucci also contends that PMC misdefines the essential functions of the nurse position (e.g., by including lifting of laundry bags as a "major task duty and responsibility"). Rappucci argues that this confuses method with function in that lifting is a method of accomplishing a task, rather than a specific job function in relation to nursing.

17

lifting of patients."11 PMC also notes that Deane conceded that the PMC job description was "an accurate reflection of the tasks, duties and responsibilities as well as the qualifications, physical requirements and working conditions of a registered nurse at [PMC]," and that among her "critical job demands" at PMC were: (1) the placement of patients in water closets, tub chairs or gurneys, (2) the changing of position of patients, and (3) the lifting of laundry bags. These pieces of evidence, contends PMC, constitute multiple admissions by Deane that lifting is an essential function of a staff registered nurse at PMC. Finally, PMC asserts that the consequences of a nurse's inability to lift patients could create a dangerous situation in the hospital for Deane and her patients.

We decline to apply conclusive effect to either the job description or PMC's judgment as to whether heavy lifting is essential to Deane's job. The EEOC's Interpretive Guidance indicates that "the employer's judgment as to which functions are essential" and "written job descriptions prepared before advertising or interviewing applicants" are two possible types of evidence for determining the essential functions of a position, but that such evidence is not to be given greater weight simply because it is included in the non-exclusive list set out in 29 C.F.R. S 1630.2(n)(3). See 29 C.F.R. pt. 1630, app. S 1630.2(n). Thus, the job description is not, as PMC contends, incontestable evidence that unassisted patient lifting is an essential function of Deane's

_____

11. Rappucci criticizes the job description for utilizing incorrect language
to describe the lifting requirements. For example, according to the Department of Labor, "frequent lifting of patients" means that the task is performed 33% to 66% of the day, or approximately 3-5 hours over an eight hour work shift. Deane contends that this description is implausible (and inaccurate) and conflicts with other testimony. For example, Joan Campagna, a registered staff nurse at PMC since 1987, swore in her affidavit that a PMC nurse typically spends only minutes per day repositioning patients in their beds, transferring patients from bed to gurney or vice versa, and moving patients into and out of wheelchairs. Moreover, Campagna notes that these tasks are nearly always accomplished by two people and that PMC employs orderlies, licensed practical nurses, and nurses aides whose duties are to assist registered nurses in all patient care activities, including the lifting and
transferring of patients.

18

job. Moreover, the EEOC Regulations also provide that while "inquiry into the essential functions is not intended to second guess an employer's business judgment with regard to production standards," whether a particular function is essential "is a factual determination that must be made on a case by case basis [based upon] all relevant evidence." Id. (emphasis added). Finally, the import of the rest of PMC's evidence (e.g., her alleged admissions, etc.) is disputed by Deane. For all these reasons, we find that there is a genuine issue of material fact on the issue of whether Deane was a qualified individual under the ADA. 12

_____

12. In view of this conclusion, we need not reach the more difficult question addressed by the panel whether "regarded as" disabled plaintiffs must be accommodated by their employers if they cannot perform the essential functions of their jobs. Deane contends that, as a matter of statutory interpretation, "regarded as" plaintiffs are entitled to the same reasonable accommodations from their employers as are actually disabled plaintiffs. She reasons that, just as we found that a plain reading of the ADA only requires plaintiffs to show that they can perform the essential functions of the job, a plain reading of the definition of "qualified individual" demonstrates that a "regarded as" plaintiff is qualified so long as she can perform the essential functions with reasonable accommodation. See 42 U.S.C.S 12111(8) (defining a "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); see also 29 C.F.R. S 1630.2(m). Moreover, Deane submits that this plain reading of the statute is buttressed by the Supreme Court's decision in Arline, 480 U.S. at 288–89 (holding that, under the Rehabilitation Act, employers have an affirmative obligation to make reasonable accommodations for employees who are perceived to be handicapped). More importantly, according to Deane, failure to mandate reasonable accommodations for "regarded as" plaintiffs would undermine the role the ADA plays in ferreting out disability discrimination in employment. This is because, following Deane's logic, the "regarded as" prong of the disability definition is premised upon the reality that the perception of disability, socially constructed and reinforced, is difficult to destroy, and in most cases, merely informing the employer of its misperception will not be enough.

In countering Deane's position, PMC notes preliminarily that a "regarded as" plaintiff's only disability is the employer's irrational response to her illusory condition. Under these circumstances, reasons PMC, it simply makes no sense to talk of accommodations for any physical impairments because, by definition, the impairments are not the statutory cause of the plaintiff's disability. Adopting Deane's

19

## C.

Finally, we find that Deane can easily establish the third prong of her prima facie case. The August 10, 1992, call from Hann terminating Deane because of her "handicap" is uncontroverted direct evidence that Deane suffered an adverse employment action because of her employer's perception of her disability. See Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997) ("When an employer concededly discharges an employee because of a disability, the employee need prove nothing more to meet the third prong of the prima facie test.").

interpretation of the ADA would, in PMC's view: (1) permit healthy employees to, through litigation (or the threat of litigation) demand changes in their work environments under the guise of "reasonable accommodations" for disabilities based upon misperceptions; and (2) create a windfall for legitimate "regarded as" disabled employees who, after disabusing their employers of their misperceptions, would nonetheless be entitled to accommodations that their similarly situated co-workers are not, for admittedly non-disabling conditions.

While we acknowledge the considerable force of PMC's argument, especially the latter point, we express no position on the accommodation issue, and note that the Equal Employment Opportunity Commission has not taken an official position yet either. See Brief for the Equal Opportunity Commission as Amicus Curiae at 6. We note, however, that if it turns out that a "regarded as" plaintiff who cannot perform the essential functions of her job is not entitled to accommodation (and therefore does not have to be reinstated), he or she need not necessarily be without remedy. The plaintiff still might be entitled to injunctive relief

against future discrimination, see EEOC v. Goodyear Aerospace, 813 F.2d 1539, 1544 (9th Cir. 1987) (listing benefits of injunctive relief, including: (1) instructing employers to comply with federal law, (2) subjecting employers to the contempt power of the federal courts for future violations, and (3) reducing the chilling effect of employers' alleged

discrimination); King v. Trans World Airlines, Inc., 738 F.2d 255, 259 (8th Cir. 1984), to compensatory or punitive damages under 42 U.S.C. S 1981a, see Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459-60 (1975) (punitive damages); Mahone v. Waddle, 564 F.2d 1018 (3d Cir. 1977) (compensatory damages), and/or to counsel fees under 42 U.S.C. S 1988(b).

III.

For the foregoing reasons, the judgment of the district court will be reversed and the case remanded to the district court for further proceedings consistent with this opinion. Although not a ground of our decision, we take this opportunity to observe that this protracted (and very much ongoing) litigation would likely have been unnecessary had the parties taken seriously the precepts announced in our opinion in Mengine v. Runyon, 114 F.3d 415 (3d Cir. 1997). In that decision, we highlighted the importance of communication and cooperation between employers and employees in seeking reasonable accommodations. See id. at 416. Specifically, we noted that, in the context of the Rehabilitation Act, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."13 Id . at 420. In this case, the single telephone interaction between Deane and McCool at PMC hardly satisfies our standard that the employer make "reasonable efforts to assist [the employee], to communicate with him in good faith, and to not impede his investigation [for employment]." Id. (citations omitted). While it may turn out that reasonable accommodation for Deane is impossible (or is not required because she is a "regarded as" plaintiff), nevertheless, an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA. Id. at 420-21.

_____

13. As we noted in Mengine, interpretations of the Rehabilitation Act's "reasonable accommodation" provisions are relevant to our analysis of the ADA and vice versa because in 1992, Congress amended the section of the Rehabilitation Act defining "reasonable accommodation" to incorporate the standards of the ADA. See 114 F.3d at 420 & n.4 (citing 29 U.S.C. S 794(d)).

GREENBERG, Circuit Judge, dissenting.

I respectfully dissent. I recognize, of course, that a "qualified individual with a disability" need not actually have an impairment that substantially limits one or more of her major life activities as it is sufficient if the employer regards her as having such an impairment. 42 U.S.C. S 12102(2)(C). Thus, if a covered employer discriminated against such an individual in a manner barred by the Americans with Disabilities Act, it would violate the Act. 42 U.S.C. S 12112(a).

But, as I see this case, the issue here is different. As the majority has pointed out, the district court found that Deane was not actually disabled and she has not appealed that determination. The issue then is whether a person who is not actually disabled can demand a reasonable accommodation from an employer. After all it was Deane who claimed to need the lifting restriction and who claimed that she had to avoid repetitive manual tasks. To me the answer has to be no. I cannot understand how an employee who is not actually disabled can indicate that she must have an accommodation for her work, and then, when the employer takes her at her word but declines to grant the accommodation, assert a valid cause of action against the employer under the ADA. Congress did not pass the ADA to permit persons without a disability to demand accommodations.

It is helpful to consider the following hypothetical. Let us assume that employees in the heavy construction industry in the ordinary course of their employment regularly lift very heavy loads. An applicant for employment who is not actually disabled indicates to the employer that she cannot lift heavy loads but requests an accommodation to avoid the lifting. The prospective employer refuses to make the accommodation. In my view, the employer does not violate the ADA, and when Deane's case is analyzed it is not different. She, too, was not disabled but asked for an accommodation.

The majority believes that there is a genuine issue of material fact as to "whether PMC misperceived Deane as being disabled." Maj. Op. at 3. But that dispute does not

22

matter, for the critical issue is not how PMC viewed Deane because there is simply no escape from the fact that an essential element of Deane's case is that "PMC failed to accommodate her lifting restriction." Maj. Op. at 5. After all, as the majority explains, "Deane maintains that she requires and is entitled to accommodation for her lifting restriction." Maj. Op. at 6. But no matter what misconceptions PMC may have had about Deane, it was Deane who requested the accommodation. Thus, even if PMC regarded her as more substantially impaired than she actually was, this misperception does not matter for she was not entitled to any accommodation. It is critical to remember that this is not a case in which the employer perceived the employee to be disabled and then refused to make the accommodation which it believed she needed.

The majority indicates that there is a genuine dispute of material fact regarding whether heavy lifting is an essential function of her former job. I agree that there is a genuine dispute of fact as to whether heavy lifting is an essential function of the job. But, just as the dispute of fact regarding PMC's perception of Deane does not matter, neither does the heavy lifting dispute because it is not material. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Inasmuch as Deane is not actually disabled, she has no right to an accommodation whether or not the accommodation would impact on her ability to perform the essential functions of the job. Furthermore, an employer can determine what it believes are the essential elements for a particular job without concern that its determination might be challenged under the ADA by a person who is not actually disabled.

In my view, this case is quite straightforward but somehow has become complicated. I respectfully dissent as I would affirm the summary judgment.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit