

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2004

# Polini v. Lucent Tech Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2285

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Polini v. Lucent Tech Inc" (2004). *2004 Decisions.* Paper 599.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/599

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-2285
_____

PATRICIA POLINI,

Appellant

v.

LUCENT TECHNOLOGIES
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No.  02-cv-00220)
Magistrate Judge: Hon. Arnold C. Rapoport

_____

Argued: January 23, 2004

Before:  ALITO, and CHERTOFF, <u>Circuit Judges</u>, and DEBEVOISE,<sup>*</sup> <u>District Judge</u>

(Opinion Filed: June 10, 2004)

> DAVID L. DERATZIAN, ESQ. (argued)
> NANCY S. SKALANGYA, ESQ.
> GEOURGE S. KOUNOUPIS, ESQ.
> Hahalis & Kounoupis, P.C.
> 20 East Broad Street
> Bethlehem, PA 18018
> *Counsel for Appellant*

* The Honorable Dickinson R. Debevoise, District Judge of the United States District Court for the District of New Jersey, sitting by designation.

ROBERT W. CAMERON (argued)
THEODORE A. SCHROEDER
LITTLER MENDELSON
Dominion Tower
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

ALITO, Circuit Judge:

Patricia Polini commenced this action against her former employer, Lucent

Technologies ("Lucent"), claiming that Lucent violated the Americans with Disabilities

Act, 42 U.S.C. § 12101 et seq. ("the ADA"), and the Pennsylvania Human Relations Act,

43 Pa. Stat. Ann. § 951 et seq. ("the PHRA")[1], when it decided not to recall her after a lay

off. According to Polini, Lucent made this decision because it regarded her as disabled.

The Magistrate Judge granted summary judgement in favor of Lucent. Because we

conclude that there are genuine issues of material fact, we vacate the order of the District

Court and remand for further proceedings.

**I.**

From 1984 to 1985, Polini worked as a "detailer" for Lucent's predecessor,

_____

[1] Analysis regarding Polini's ADA claim is dispositive of her PHRA claim. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) ("analysis of an ADA claim applies equally to a PHRA claim").

AT&T, and in this capacity she was required, without the aid of a microscope, to examine computer chips for defects. She was later given the job of "process checker," which required her to use a monocular microscope to repair chips. She was laid off as part of a reduction in force in 1985.

Polini was a member of the International Brotherhood of Electrical Workers ("the Union") and was covered by a collective bargaining agreement between the Union and the employer. In 1995, Lucent began contacting former Union-represented employees about returning to work. The Human Resources department, under the direction of Deborah Harris (Human Resource Manager) and the supervision of Edgar Tanner (Labor Relations Operations Manager), organized the laid-off individuals into groups based on seniority. Human Resources employees contacted former employees on the list and asked if they were interested in being recalled. Each individual who expressed an interest was then scheduled for a physical examination in Lucent's Health Services department. The physical examination consisted of a drug test, a hearing test, a vision test, and a general physical.

According to Harris, Health Services was apparently provided with *some* information about the nature of the position or positions that were to be filled, but just how much information was provided is not clear. Harris, who was described by the Magistrate Judge as the person who was "most knowledgeable about the recall operation," provided the following explanation:

A. They know what jobs -- again, just sort of briefly or generically, they know what jobs we're hiring for. They don't necessarily, need to know that, but just the rapport we had with the people we talked to a daily basis when the hiring first started. They know if we're hiring for clean room or bench hand or something like that.

Q. Are they looking for something different -- that's a bad example. Were they looking at something different for bench hand versus an accountant?

A. No. No. Versus accountant, possibly so.

Q. That's why I made it that distinction.

A. Yes.

Q. Are they looking for something different for a bench -- for a clean room operator versus a custodian or somebody in maintenance?

A. I can't answer that.

Q. Do they need to know or do you tell them what the job descriptions of the positions you're hiring for are?

A. We really don't have to get into that, as long as they know it's for a manufacturing position, unless there are some issues that come out of something, out of the examination or out of the hiring process.

App.[2] 166-67. When this portion of the deposition is viewed in the light most favorable to Polini, the non-moving party, the most that can be said is that Health Services was given a very general idea of the position or positions that were to be filled.

Once Health Services completed its exam, it reported to Human Resources whether the person had passed or failed. According to Harris, after Health Services

---

[2]"App." refers to the Joint Appendix.

-4-

completed an examination, it would give Human Resources "a piece of paper," "[c]ould be [a] piece of notebook paper" saying whether the person had "passed or failed" App. 174-75. She added: "Just something briefly." Id. at 175. If Health Services reported that a person had failed the physical, the person would not be recalled. App. 179-80.

When Polini reported for her physical examination, Mary Silver, a Health Services nurse, administered the vision test. According to Silver, Polini told her that she was blind in her right eye. The vision examination that Silver conducted was the titmus vision orthrator ("the test").[3] During the test, Silver permitted Polini to keep her glasses on at times and to remove them at other times. The test results revealed that Polini had 20/200 vision in her right eye and 20/25 vision in her left eye, and her stereo depth perception was assessed as poor.

Following the vision examination, Dr. Frank Capobianco performed a physical examination of Polini and reviewed the results of Nurse Silver's testing. However, Dr. Capobianco did not know that Polini did not have her glasses on during the entire vision examination, and he testified that this fact would have been important to him. App. 256-57. Dr. Capobianco determined that Polini had severe morbid obesity, hypertension, and monocular vision and that she might "have restrictions for enclosed workspace or restrictive clothing." Id. at 260-62, 414. He also identified certain job-related

_____

[3] The titmus test is an occupational vision test that is standard in the industry. The test screens for problems in the areas of near vision, far vision, color vision, depth perception, and vertical and lateral vision.

restrictions, including an inability to perform "tasks requiring binocular vision" due to "essential blindness right eye." Id. at 260-61, 265, 416. In accordance with Lucent policy, however, he noted that his final assessment was being deferred until he received further medical information from Polini's primary care physician.

On December 2, 1998, Dr. Capobianco referred Polini to her primary health care physician, Dr. Steven Farbowitz, and faxed Dr. Farbowitz a copy of the job descriptions for utility operator positions contained in the labor contract between the Union and Lucent. Dr. Farbowitz is not an ophthalmologist, and the records that he submitted to Lucent contain no indication that he performed a vision examination on Polini. In addition, Polini testified that Dr. Farbowitz did not perform a vision examination. App. 107. She also stated that she did not discuss with Dr. Farbowitz whether she could perform visual inspections. Nonetheless, on December 4, 1998, Dr. Farbowitz issued a one sentence note stating: "Pat Polini is qualified for the job of utility operator." Id. at 438.

Polini returned to Lucent's Health Services department on December 10, 1998. As of that date, Dr. Capobianco had already reviewed Dr. Farbowitz's note. Dr. Capobianco placed the same job-related medical restrictions on Polini on December 10, 1998, as he had tentatively placed on her earlier. Specifically, he again noted that Polini "can't do tasks requiring binocular vision." App. 440. Dr. Capobianco determined that Polini's vision was "functionally monocular," meaning that "the poorer eye cannot be corrected

enough when binocular vision is important for things requiring acute depth perception or binocular instrument use to be able to do it." Id. at 266-67.

After Dr. Capobianco completed this report, Health Services informed Human Resources that Polini had failed the exam, and Polini was not recalled. It appears that Lucent did not retain whatever document Health Services used to convey its conclusion to Human Resources. App. 175.

A few weeks after December 10, 1998, Polini called the Union to ascertain her recall status. She testified that a Union representative read to her the forms that had been prepared by Health Services concerning her physical examination. App. 51-55. Polini also testified that the same Union representative informed her that Dr. Capobianco had said that she had numerous restrictions and that she suffered from macular degeneration. App. at 31-32. After speaking with this Union representative, Pollini received via fax the records that Dr. Capobianco had prepared. Polini believes that the Union informed her on January 15, 1999, that Lucent was not going to recall her. Although she spoke to her Union representatives, Polini never spoke with any Lucent representative concerning why she was not recalled.

After learning of Lucent's decision, Polini went to an ophthalmologist, Dr. William J. Kitei, on February 12, 1999. Polini told Dr. Kitei that she had been informed by Lucent that she had macular degeneration. Based on his examination, Dr. Kitei opined that Polini was "capable of performing almost any job for which she is capable." App.

497. Dr. Kitei's records were never sent to any representative of Lucent's Health Services or Human Resources departments. Moreover, Tanner, Harris, and Silver all testified that they never saw Dr. Kitei's record prior to their depositions in this case. Id. at 138-39, 182-83, 240.

On February 28, 1999, the Union filed a grievance on Polini's behalf, challenging Lucent's decision not to recall her. The grievance alleged that Polini was being discriminated against because she was overweight but made no reference to her vision. App. 441. No information concerning Dr. Kitei's examination or any other new medical information was presented during the grievance proceedings, and the grievance was denied.

## II.

The Magistrate Judge granted summary judgment in favor of Lucent on two grounds. First, the Magistrate Judge concluded that Polini was not "regarded as" substantially limited in seeing or working. The parties had disagreed as to the identity of the relevant decision maker at Lucent. Polini argued that the decision not to recall her was actually made by Dr. Capobianco and Nurse Silver, whereas Lucent took the position that the relevant decision makers were Harris, the Human Resource Manager, and Tanner, the Labor Relations Operations Manager. The Magistrate Judge agreed with Lucent because "Harris and Tanner possessed all the decision-making authority," and the Magistrate Judge concluded that Harris and Tanner did not regard Polini as substantially

limited in the major life activities of seeing and working because they had not seen Dr. Capobianco's reports and did not know anything about Polini's medical condition other than that she had failed the physical and the vision test. A18-19.[4] The Magistrate Judge rejected the argument that Dr. Capobianco and Nurse Silver were the real decision makers because they "simply conducted medical examinations" and had "no idea what Human Resources would do with the information Health Services provided." A18-19. Moreover, the Magistrate Judge observed that there was no evidence that Dr. Capobianco or Nurse Silver regarded Polini as disabled. A17. Rather, the Magistrate Judge stated, they "simply noted that [Polini] was unable to use a binocular microscope." A17.

Second, the Magistrate Judge held that, even if Lucent had regarded Polini as having a disability, Lucent was nevertheless entitled to summary judgment based on the defense recognized in Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 192-94 (3d Cir. 1999). Under Taylor, "[i]f an employer regards a plaintiff as disabled based on a mistake in an individualized determination of the employee's actual condition . . ., then the employer [has] a defense if the employee unreasonably failed to inform the employer of the actual situation." Id. at 193 (footnote omitted). The Magistrate Judge noted that Polini did not give Lucent a copy of Dr. Kitei's report and that the grievance filed by the Union did not take issue with Dr. Capobianco's assessment of Polini's vision but instead contended that Lucent was discriminating against Polini because she was overweight.

---

[4]"A" refers to the documents bound with the Appellant's brief.

A20-21.

## III.

We exercise plenary review over a District Court's grant of summary judgment. Koslow v. Pennsylvania, 302 F.3d 161, 167 (3rd Cir. 2002). In evaluating the District Court's grant of summary judgment in favor of Lucent, we must determine whether there are any genuine disputes of material fact. Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002). If not, then viewing the evidence in the light most favorable to Polini, we must decide whether Lucent was entitled to judgment as a matter of law. See FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The ADA prohibits "discrimination against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). In order to establish a *prima facie* case of discrimination in violation of the ADA, a plaintiff must prove that she "(1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." See Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998) (en banc).

A plaintiff may establish that she has a disability by showing that (1) she suffers a physical or mental impairment that substantially limits one or more of her major life activities, (2) she has a record of such impairment, or (3) she was "regarded as" having such an impairment by her employer. See Marinelli v. City of Erie, Pa., 216 F.3d 354, 359 (3d Cir. 2000). On appeal, Polini argues only that Lucent regarded her as disabled.

-10-

Polini does not claim that she had an impairment that actually limited a major life activity or that she had a record of such an impairment.

The Supreme Court has defined "substantially limited" as "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002) ("In determining whether an individual is substantially limited in a major life activity . . . the following factors should be considered: the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact of or resulting from the impairment.") (internal quotations and citation omitted). An individual is not substantially limited unless she has "an impairment that prevents or severely restricts [her] from doing activities that are of central importance to most people's lives." Id. at 185.

To be "disabled" under the "regarded as" portion of the ADA's definition of disability, Polini must demonstrate either that (1) although she had no impairment at all, Lucent erroneously believed that she had an impairment that substantially limited a major life activity or (2) that she had a nonlimiting impairment that Lucent mistakenly believed limited a major life activity. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999); Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001).[5]

_____

[5] The EEOC regulations also allow for an individual to establish that s/he is "regarded as" disabled if s/he "[h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such

The major life activities in which Polini claims Lucent regarded her as substantially limited are seeing and working. In this connection, Polini points in particular to Dr. Capobianco's statement that she had monocular vision. The Supreme Court has held that monocularity is not "a per se disability," but the Court has added that its "brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision 'ordinarily' will meet the [ADA's] definition of disability." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566-67 (1999); see also Sutton, 527 U.S. at 472 ("whether a person has a disability under the ADA is an individualized inquiry"). The Court noted that persons with monocular vision "vary by the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustment in visual techniques, and the ultimate scope of the restriction on their visual abilities." Id. at 566. As a result, the Court concluded, "monocular individuals" must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." Id. at 567.

**IV.**

Lucent defends the decision of the Magistrate Judge on the ground that the relevant decision makers were Harris and Tanner and that they did not regard Polini as

---

impairment." 29 C.F.R. § 1630.2(l)(2). See Sutton, 527 U.S. at 490 ("These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of . . . individual ability.'") (citing 42 U.S.C. § 12101(7)).

suffering from monocular vision or, indeed, any other particular vision impairment. All that they knew, Lucent stresses, was that Polini had failed the vision test.

Polini, on the other hand, contends that Harris and Tanner were not the ultimate decision makers because the recall decision was controlled by the outcome of the medical evaluation. Polini notes that, during the grievance proceeding, Tanner stated that he had no ability to recall Polini because "Medical won't let her in." App. 535. Therefore, according to Polini, the relevant decision makers were Dr. Capobianco and Nurse Silver.

Although the Magistrate Judge held that Harris and Tanner were the relevant decision makers, we conclude that there is at least a genuine dispute of fact on this question. As noted, Polini's claim is that she was not recalled because she was regarded as having a disability. See Pocono Med. Ctr., 142 F.3d at 142. Thus, the focus must be on the person or persons whose determinations in fact controlled the decision not to recall her. This is not a case in which the person having the formal decision making authority deferred to a report or recommendation submitted by someone else but nevertheless exercised at least some measure of independent judgment. Cases of that sort present issues that we need not confront here. As portrayed to us by both sides, this case, by contrast, is one in which a reasonable fact finder could find (and perhaps would be obligated to find) that the officials with the formal decision making authority, i.e., those in Human Resources, exercised no judgment whatsoever. Instead, it may be that the real decision making authority was in effect delegated to Health Services. As noted, Health

Services was given some information about the positions for which the person to be examined was being considered; Health Services then presumably made some judgment about the physical requirements of those positions and about the physical capabilities of the person who was examined; and Health Services ultimately informed Human Resources whether the person had passed or failed the basic components of the exam. If Health Services told Human Resources that the person had failed, Human Resources automatically declined to recall the individual. Under these circumstances, a reasonable fact finder certainly could find (and might be required to find) that Health Services was the real decision maker for present purposes.

Lucent maintains that it is entitled to summary judgment even if the real decision making occurred in Health Services because "Dr. Capobianco and Harris merely concluded that Polini had monocular vision and could not use a binocular microscope. There is no evidence that they believed Polini's vision limited her daily activities or that she was disqualified from more than one particular job." Appellee's Br. at 15. We do not agree.

The pertinent question is whether Health Services decided that Polini had failed the vision test because it considered her vision to be impaired to such a degree that it substantially restricted her in the major of life activities of seeing or working. As noted, monocularity is often a disability, and here Dr. Capobianco also stated that Polini was essentially blind in one eye. We conclude that the record is sufficient to create a genuine

-14-

issue as to whether Health Services decided that Polini had failed the vision test because Dr. Capobianco regarded her as substantially limited in the major life activity of seeing.

We believe that evidence in the record also creates a genuine issue on the question of whether Health Services decided that Polini had failed the vision test because Dr. Capobianco regarded her vision as preventing her from performing a broad class or range of jobs. Although it appears that Dr. Capobianco reviewed the job description of the specific job that was open, it is not at all clear that Health Services' decision that Polini had failed the vision test was based merely on the belief that she lacked the visual acuity needed for that position. The long passage from Harris's deposition that was quoted above may be read to say that Health Services customarily considered only whether a person was physically capable of a "generic[]" type of job, such as "a manufacturing position." App. 166-67. Thus, the summary judgment record leaves open the possibility that Health Services' decision that Polini had failed the vision test was based on the conclusion that she lacked the vision needed for a broad class or range of jobs.

For these reasons, we hold that the Magistrate Judge erred in granting summary judgment for Lucent on the ground that Polini was not regarded as having a disability.

## V.

The Magistrate Judge held that Lucent was entitled to summary judgment on the alternative ground that Polini unreasonably failed to bring to Lucent's attention evidence that the evaluation of her vision in Dr. Capobianco's report was inaccurate. In this

connection, Lucent notes that Polini possessed Dr. Kitei's report by the time of the grievance proceeding but that this report was not furnished to Lucent. Lucent argues as follows:

> Polini knew in December 1998 that her vision was an issue with respect to her recall, and that Dr. Capobianco had opined in his report that she "can't do tasks requiring binocular vision." . . . . Notwithstanding her knowledge of this issue, Polini never informed Lucent Human Resources or Health Services that her vision had allegedly been improperly assessed.

Appellee's Br. at 35.

The defense recognized in <u>Taylor</u> is "fact-specific," 177 F.3d 194, and we believe that a reasonable fact finder could find on the present record that Polini acted reasonably. First, it does not appear that Polini was ever informed precisely why she was not recalled. Polini stated that no one at Lucent ever told her the basis for the decision, App. 51, 56-58, and Lucent has not pointed to any contradictory evidence in the summary judgment record. Polini presumably knew that the decision was based on medical reasons, but Dr. Capobianco's report of December 10, 1998, which was faxed to Polini by her union representative, set out several restrictions in addition to the inability to "do tasks requiring binocular vision."[6] App. 441. Although Harris stated in her deposition that the only

---

[6]Lucent does not claim that it ever told Polini that her vision was the sole reason why she was not recalled, but Lucent claims that she nevertheless deduced that this was the ground for the decision. Lucent argues as follows. Although Dr. Capobianco's final report imposed restrictions not related to Polini's vision – <u>viz</u>., "No Work at Unprotected Elevation," "No Ladder or Pole Climbing," and "No Frequent Squatting or Bending," see App. 440, Polini acknowledged during her deposition that Dr. Capobianco told her that "as a utility operator, you don't have to climb ladders or stoop for eight hours." App. 52.

reason why Polini was not recalled was her failure to pass the vision test, App. 178-79, it is not clear that either the company and union representatives at the grievance meeting understood this. As noted, the grievance filed by the union referred to Polini's obesity, not her vision. At the step IV grievance meeting, a company representative referred to all three of the conditions mentioned in Dr. Capobianco's first report – "[s]evere morbid obesity, hypertension, binocular vision" – and most of the discussion concerned Polini's weight. App. 534-35.

Second, it does not appear that Polini was ever informed that Dr. Capobianco believed (based on Nurse Silver's report of the vision exam) that Polini had monocular vision even when wearing corrective lenses. This was important because Polini knew that, without correction, her vision in one eye was very poor. Thus, without knowing that Dr. Capobianco was referring to her *uncorrected* vision, she had less reason to challenge his statement.

---

Lucent therefore reasons that Polini must have known that her vision was the sole reason why she was not recalled. Lucent also notes that, after Polini learned that she would not be recalled, the only physician whom she saw was an eye doctor.

While the evidence to which Lucent points is sufficient to support a finding that Polini knew the reason for the contested decision, it is not sufficient to prevent a reasonable fact finder from reaching the opposite conclusion. Polini's union representative gave Polini a copy of Dr. Capobianco's earlier report, which referred to "severe morbid obesity" and "hypertension," and the grievance filed on Polini's behalf stated that she was being discriminated against based on obesity. As noted, Polini's obesity was a major topic of discussion at the Step IV Grievance Meeting. See App. 534-35. We hold that there is a genuine issue as to whether Polini knew that her vision was the only reason for the company's decision.

-17-

Third, although Lucent asserts in its brief that only one position ("Utility Operator: Wafer Fabrication Operations") was open and that this position requires the use of a binocular microscope, Appellee's Br. at 5-6, Lucent has not called to our attention any evidence that Polini was informed of either of these facts. When Nurse Silver faxed job descriptions to Polini's physician, Dr. Farbowitz, her cover memo referred to "utility operator job description*s,*" App. 430 (emphasis added), and job descriptions of several different utility operator positions were attached. Id. at 432-37. In addition, the job description for the position of "Utility Operator: Wafer Fabrication Operations" stated that the job involved "visual . . . inspections," but there was no mention of a binocular microscope. Id. at 436.

Lucent's Taylor argument, therefore, amounts to the following. Polini acted unreasonably in failing to inform Lucent that she has binocular vision after correction even though she did not know that she was not recalled solely because of her vision, she did not know that Dr. Capobianco believed that she was essentially blind in one eye even after correction, and she did not know that the only position for which she was considered required binocular vision. Contrary to Lucent's position, we conclude that a reasonable fact finder could find that Polini acted reasonably under these circumstances.

## VI.

For the reasons stated above, the District Court's grant of summary judgment in favor of Lucent is reversed, and the case is remanded.