

Villanova University School of Law

Villanova University School of Law Digital Repository

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-27-2003

# Conneen v. MBNA Amer Bank NA

Precedential or Non-Precedential: Precedential

Docket No. 02-1504

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Conneen v. MBNA Amer Bank NA" (2003). *2003 Decisions.* Paper 396.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/396

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 27, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1504

MARGARET D. CONNEEN,

Appellant

v.

MBNA AMERICA BANK, N.A.

On Appeal from the United States District Court
for the District of Delaware
(Dist. Ct. No. 00-cv-00944)
District Judge: Hon. Gregory M. Sleet

Argued: November 7, 2002

Before: McKEE, GREENBERG, *Circuit Judges* and
LIFLAND,* *District Judge*

(Opinion Filed: June 27, 2003)

JEFFREY. K. MARTIN, ESQ. (Argued)
Jeffrey K. Martin, P.A.
1509 Gilpin Avenue
Wilmington, Delaware 19806
*Attorney for Appellant*

---

* Honorable John C. Lifland, Senior Judge of the United States District
Court for the District of New Jersey, sitting by designation.

BENJAMIN N. GUTMAN, ESQ.
  (Argued)
Equal Employment Opportunity
  Commission
1801 L. Street, N.W.,
Washington, DC 20507
*Attorney for Amicus-Curiae-EEOC*

SHELDON N. SANDLER, ESQ.
  (Argued)
JOANNE C. SPRINGER-MESSICK
Young Conaway Stargatt &
  Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
*Attorneys for Appellee*

---

## OPINION OF THE COURT

---

McKEE, *Circuit Judge.*

Margaret Conneen[1] appeals the district court's dismissal of the suit she brought against MBNA America Bank, N.A., her former employer. She alleges that her termination from MBNA was a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 and 28 U.S.C. § 1343(a)(4) (the "ADA"), and a breach of obligations imposed on MBNA by the covenant of good faith and fair dealing implied under Delaware law. The district court granted summary judgment in favor of MBNA, and against Conneen, and this appeal followed. The court concluded that Conneen was not entitled to the protection of the ADA because she could not demonstrate that she could perform the essential functions of her job with or without an accommodation. Although we disagree with that conclusion, we nevertheless affirm the grant of summary judgment in favor of MBNA as there is no genuine issue of material fact that would allow a reasonable

---

1. Margaret Conneen is now known as Margaret Dayton. To avoid confusion, we will refer to her as "Conneen."

juror to conclude that MBNA terminated Conneen because of her disability or that MBNA failed to engage in the interactive process as required under the ADA.

## I.  BACKGROUND

Conneen was employed by MBNA from July 21, 1986 through June 25, 1998. During that time she rose to the position of Marketing Production Manager. She went on short-term disability leave in September of 1996, after she began suffering from clinical depression. Her treating psychiatrist, Dr. Alan Seltzer, diagnosed her as suffering from a "major depressive episode with severe psychotic symptoms." The medications he prescribed included Effexor, an antidepressant.

In December of 1996, Dr. Seltzer noted that Conneen was "in partial remission" and "no longer psychotic," and he removed her from all medications except Effexor. Shortly thereafter, on February 18, 1997, Conneen met with an MBNA Health Services nurse, who approved Conneen's return to work. The very next day, Conneen returned to work on a part-time basis, working four hours per day. In March of 1997, Conneen resumed her regular hours working full-time from 8:00 a.m. to 5:00 p.m. with no restriction or accommodation for her depression. However, Conneen continued to take Effexor pursuant to Dr. Seltzer's recommendation, and that medication purportedly resulted in "morning sedation," which made it difficult for her to function in the mornings.[2]

John Miller, Conneen's manager at the time, expressed concern about Conneen's frequent tardiness, and suggested to Conneen that she speak with a representative of MBNA's Health Services unit if her tardiness was related to illness.

---

[2]. Dr. Seltzer was actually quite equivocal about the relationship between Conneen's medication and difficulties she had arriving for work on time. At his deposition he testified that "[i]t is possible but not likely," that the Effexor was the cause of Conneen's tardiness in the morning. App. at B116. However, inasmuch as we are reviewing a grant of summary judgment we must view this evidence in the light most favorable to Conneen. *Matczak v. Frankford Candy and Chocolate Company*, 136 F.3d 933 (3rd Cir. 1997).

On June 5, 1997, Conneen met with an MBNA nurse. As a result of that conversation, MBNA agreed to accommodate Conneen by allowing her to begin work at 8:30 a.m. instead of 8:00 a.m.

In a subsequent visit on June 16, 1997, Dr. Seltzer concluded that Conneen's depression was in partial remission, and by October 28, 1997, Dr. Seltzer concluded that Conneen was "doing well." Nevertheless, sometime in 1997, Conneen was allowed to begin reporting to work at 9:00 a.m. and working until 6:00 p.m. rather than working from 8.00 a.m. to 5:00 a.m. However, in spite of this further accommodation, Conneen's punctuality was "substandard," sometimes arriving as late as 9:30 a.m. On November 4, 1997, MBNA gave Conneen a "final warning" because she had reported to work intoxicated two days earlier. In that warning, MBNA warned Conneen that she would be terminated for any further misconduct.

Conneen next visited Dr. Seltzer on January 20, 1998, and the doctor noted that she had been "doing well for six months." Nevertheless, the doctor decided against altering Conneen's dose of Effexor because she was then struggling through divorce proceedings and the doctor was concerned about the impact of those proceedings on Conneen's depression.

On January 30, 1998, Conneen met with her new manager at MBNA, Rose Behm, to discuss her schedule. Behm did not know that Conneen had an adjusted schedule nor was she aware of Conneen's history of depression or morning sedation resulting from her medication. Conneen told Behm that her schedule had been adjusted to allow her to start work an hour later, but she did suggest that the adjustment was related to an accommodation for a medical condition. Behm asked Conneen if anything prevented her from returning to a normal 8:00 a.m. to 5:00 p.m. schedule. Despite the problems Conneen was continuing to have with punctuality, she assured Behm that there was no reason she could not resume reporting to work at 8:00 a.m. and working until 5:00 p.m. Conneen did not request continuation of the accommodation of a later starting time,

nor did she give Behm any reason to believe that an accommodation may be necessary.

Accordingly, Conneen began reporting to work at 8:00 a.m. on February 9, 1998. However, Conneen's tardiness soon resurfaced and she was late for work on February 18, 19, 20, and 24, 1998. On February 24, 1998, Conneen's acting supervisor, Anne Casey,[3] and Fran Hahn, Casey's supervisor, met with Conneen to discuss the recurring tardiness. During this conversation, Conneen was asked once again if there was any reason why she (Conneen) was unable to report to work on time, and she once again said there was no reason she could not do so. Conneen was then warned that "continued excessive, unexcused tardiness would not be tolerated," Appellee's Br. at 6, and Conneen agreed to be on time in the future.

Despite that promise of punctuality, less than a week went by before Conneen was again late for work. She reported late on February 26 and 27 as well as March 2, 3, 4, and 5, 1998. On March 6, 1998, Conneen again met with Hahn, Casey, and Catherine Willey, a representative from MBNA's Personnel Department. At that meeting, Conneen was told that her continued tardiness could result in dismissal. Conneen then informed them for the first time that she had a medical condition that caused her to be late, and that she could provide documentation from her physician to justify her need for an accommodation. Conneen's managers requested the offered documentation and Conneen asked Dr. Seltzer to supply it.

In response to Conneen's request, Dr. Seltzer drafted a letter to MBNA in which he stated: "because of Ms. Conneen's condition, she will be generally unable to begin work before 9:00 a.m." App. at B3, B122. Based upon that documentation, MBNA allowed Conneen to work from 9:00 a.m. to 6:00 p.m. each day.

However, inasmuch as there was some question as to how long Conneen would need that accommodation, Nurse Patricia Peterson obtained Conneen's permission to contact

---

3. Ms. Behm, Conneen's actual supervisor, was on maternity leave during this time.

Dr. Seltzer on behalf of MBNA to determine when Conneen could resume a regular schedule.[4] Nurse Peterson subsequently testified that, based upon the ensuing conversation with Dr. Seltzer on April 7, she concluded that Conneen's morning sedation was a temporary reaction to medication, that the dosage would be corrected, and that Conneen would be able to resume her regular schedule in a couple of weeks.[5]

Dr. Seltzer also filled out an MBNA disability form in response to Nurse Peterson's request for documentation to support affording Conneen a later starting time. On the form, Dr. Seltzer described Conneen as suffering from "dysphoria." Dr. Seltzer did not, however, suggest that an adjusted schedule was necessary, nor did he affirm that Conneen's condition or medication interfered with her getting to work on time.

As a result of Nurse Peterson's conversation with Dr. Seltzer, Casey advised Conneen that she could continue to report to work at 9:00 a.m. through April 22, 1998, but that she must thereafter resume reporting at 8:00 a.m. Conneen testified at her deposition that she relied on Nurse Peterson's description of the contents of her conversation with Dr. Seltzer. However, Conneen also testified that she did tell Nurse Peterson that she was not comfortable with the change, and that she disagreed with the decision to remove the accommodation of an hour extra to report for

4. Dr. Seltzer testified at his deposition that he intended to allow Conneen to arrive at 9:00 temporarily, not permanently.

5. The precise content of Nurse Peterson's April 7 discussion with Dr. Seltzer is disputed. In his deposition, Dr. Seltzer denied that he told Nurse Peterson or anyone else at MBNA that Conneen would be able to return to work at 8:00. Dr. Seltzer testified that he was certain of this because he never allows a patient to have her schedule modified without first seeing and speaking with the patient. However, Dr. Seltzer also testified that Nurse Peterson's notes of their conversation corroborated her recollection of the conversation and that Conneen returning to the earlier schedule in two weeks "made sense medically," because two weeks is a reasonable time to adjust to a change in medication. Moreover, Dr. Seltzer stated in his affidavit, "if the nurse said that she spoke with me on that date, . . . I had no reason to doubt it." App. at A36, B126-7.

work in the morning. Conneen nevertheless asserts that she felt that she had no alternative but to begin working at 8:00 as Peterson requested. Nevertheless, despite being allowed to report at 9:00 a.m. for a few more weeks, Conneen showed up for work after 9:00 a.m. on April 17.[6]

On April 24, Casey and Willey met with Conneen yet again to remind her that she was to begin work at 8:00 starting on April 27, and Conneen agreed to resume starting at 8:00 a.m. She did not request continuation of the accommodation of the later start time of 9:00 a.m. Conneen explains her failure to ask for continuation of the accommodation at this meeting by arguing that she did not feel comfortable discussing her medical situation with her manager or anyone from the personnel department at MBNA. Appellant's Br. at 9. However, it is uncontested that she also failed to thereafter ask Dr. Seltzer to contact MBNA on her behalf or to suggest that Nurse Peterson have another conversation with Dr. Seltzer to confirm that she was ready to resume reporting to work at 8:00 a.m. Rather than attempting to have MBNA continue an adjusted work schedule or contact Dr. Seltzer before making a final decision in that regard, Conneen agreed to the resumption of her 8:00 a.m. to 5:00 p.m. schedule and assured Casey and Willey that she would be punctual.

However, Conneen's history was a more accurate predictor of her future performance than those assurances were. Despite the assurances of punctuality, Conneen arrived late on April 27, 28, and 29 as well as May 1, 1998. On May 1, Willey urged Conneen to speak with Nurse Peterson. Conneen did meet with Nurse Peterson and the two discussed Conneen's adjustment to her medication as well as concerns about Conneen's punctuality. During that meeting Conneen again failed to even suggest that her tardiness might be related to her medication or history of depression. Moreover, despite that meeting, Conneen's pattern of late arrivals continued and she was late for work again on May 6, 8, and 11, 1998.

---

6. Conneen does not suggest that she needed more than an extra hour to report for work in the morning.

On May 15, Conneen and Willey met and Willey offered Conneen a brief leave of absence with pay so that Conneen could consider whether she wanted to continue working as an officer at MBNA. Willey also offered Conneen the opportunity to transfer to a non-officer, non-manager position, which would have allowed her to work a different schedule. Finally, Willey told Conneen that in lieu of termination, she would accept her resignation if Conneen wished to pursue that path. On May 18, 1998, Conneen rejected each of those alternatives and told Willey that she would be on time each day.

Following that meeting, Conneen did begin to report for work on time, but her punctuality was again short lived. After reporting punctually at 8:00 a.m. for almost a full month, she lapsed back into tardiness and was late on June 16, 17, 18, and 22. Willey met with her once again on June 23 to discuss the situation. Amazingly, given her current claims under the ADA, Conneen still refrained from suggesting a link between her medication and her tardiness at the June 23 meeting despite warnings of termination and offers to accept her resignation. Conneen still requested no further accommodation. Rather than suggest a medicinal reason for her behavior or attempt to involve her treating physician, she attempted to explain her most recent tardiness by claiming: she had been "stuck in traffic," her dog "made a mess," and that she needed to give her mother a ride one day.[7]

On June 25, 1998, MBNA finally terminated Conneen for her excessive tardiness. Immediately following her termination, Conneen contacted Dr. Seltzer, who informed her that he had never told Nurse Peterson that Conneen was ready to begin working at 8:00 a.m. Shortly after that contact with Conneen, Dr. Seltzer wrote a letter to MBNA in which he stated that Conneen needed to be allowed to arrive late for work because of her condition and asking MBNA to reinstate her.[8]

---

7. She later admitted that each of the excuses was a lie.

8. On January 14, 2000, MBNA in-house counsel, Omar McNeill, and Nurse Peterson contacted Dr. Seltzer to discuss his April 1998 conversation with Nurse Peterson. During that conversation, Peterson

## II.  PROCEDURAL HISTORY

Conneen subsequently filed this civil action against MBNA in the United States District Court for the District of Delaware. In the first count of her complaint she alleges that MBNA violated the ADA by "withdrawing from the previously granted accommodation which permitted her to report to work one hour later than other managers." *Conneen v. MBNA Am. Bank*, 182 F. Supp. 2d 370, 373 (D. Del. 2002). In the second count she alleges that MBNA breached its duty of good faith and fair dealing under Delaware law.

The district court granted MBNA's motion for summary judgment and dismissed both claims. The court held that MBNA did not "fail to accommodate Conneen because it did not have notice of her disability at the relevant time." *Id.* at 377. The court also held that reporting to work at 8:00 a.m. was an essential function of Conneen's job. Accordingly, the court concluded that Conneen could not establish a *prima facie* case of disability discrimination since she "could not perform the essential functions of her job with accommodation," *id.*, and she was therefore not protected under the ADA. The court also rejected Conneen's assertion that MBNA had acted in bad faith. This appeal followed.

In addition to appealing the aforementioned rulings, Conneen argues that the district court's finding that Dr. Seltzer authorized resumption of the 8:00 a.m. schedule was error because the Unemployment Insurance Appeal Board had reached a contrary conclusion and the court was therefore collaterally estopped from reaching a different factual conclusion.

---

and McNeill formed the impression that Dr. Seltzer had indeed approved Conneen's return to her 8:00 starting time. McNeill sent Dr. Seltzer a letter confirming that understanding and Dr. Seltzer verified the accuracy of it with a handwritten note.

Conneen later produced an affidavit in which Dr. Seltzer alleged that he found several inaccuracies in McNeill's letter after he signed and verified it. In the affidavit, Dr. Seltzer reiterated that he never told MBNA that Conneen was ready to begin working at 8:00 a.m.

## III. DISCUSSION[9]

### A. The ADA Claims

Conneen first claims that MBNA's withdrawal of the accommodation of allowing her to start work an hour later was unreasonable. She argues that the continuing effects of her medication made it exceedingly difficult to consistently report for work at 8:00 a.m. and insists that she could have performed the essential functions of her job had MBNA continued allowing her to report for work at 9:00 a.m.

An employer commits unlawful disability discrimination under the ADA if he/she "does not mak[e] reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability. . . ." 42 U.S.C. § 12112(b)(5)(A); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999). Here, MBNA does not contest that Conneen suffered from a disability, nor that it was aware of the disability. Indeed, MBNA accommodated that disability for some time. "Rather, the dispute centers around whether Conneen voiced her desire for further accommodation to MBNA after the initial accommodation." *Conneen*, 182 F. Supp. 2d at 377. Put another way, the issue before us is whether the breakdown in the interactive process required under the ADA is attributable to MBNA or Conneen. Before resolving that question, however, we must first determine if reporting to work at 8:00 a.m. was an essential function of Conneen's job. As noted, the ADA prohibits discrimination against one who is a "qualified individual with a disability." 42 U.S.C. § 12112(a). A qualified individual with a disability is defined as a person "with a disability who, with or without

9. Our review of the district court's decision to grant summary judgment is plenary. Summary judgment should be affirmed if there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We must examine the evidence in the light most favorable to the nonmoving party, Conneen, and resolve all reasonable inferences in her favor. *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997). In employment discrimination cases, the summary judgment standard is "applied with added rigor" because "intent and credibility are crucial issues." *Id.* (quoting *Robinson v. PPG Indus. Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994)).

reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). MBNA argues that Conneen cannot recover under the ADA because starting work at 8:00 a.m. was an essential function of her job. The district court agreed and concluded that MBNA is therefore entitled to judgment as a matter of law.

### 1. Was The Earlier Starting Time An Essential Function of Conneen's Job?

In order to establish that a plaintiff is "qualified" under the ADA, the employee must show that he/she "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3rd Cir. 2001). If the plaintiff is able to make that showing, he/she must then establish that "with or without reasonable accommodation, [he/she] can perform the essential functions of the position held or sought." *Id.* MBNA does not contest that Conneen possesses the requisite "skill, experience, education," her job requires or that she has the ability to satisfactorily perform her duties. Rather, as noted above, MBNA insists that reporting for work is an essential component of Conneen's job, and her inability to do that on a consistent basis renders her unqualified for the managerial position she claims she is entitled to. However, we disagree with that position and conclude that the district court erred in accepting it.

"Essential functions" must be "fundamental" to one's job and not simply "marginal." *Skerski*, 257 F.3d at 279 (quoting 29 C.F.R. § 1630.2(n)(1)). The inquiry into whether a job requirement is essential to one's job "is a factual determination that must be made on a case by case basis [based upon] *all* relevant evidence." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3rd Cir. 1998) (*en banc*)) (quoting 29 C.F.R. pt. 1630, app. § 1630.2(n)). Relevant evidence may include, but is certainly not limited to, " 'the employer's judgment as to which functions are essential' and 'written job descriptions prepared before advertising or interviewing applicants for the job.' " *Id.* However, the

employee's actual experience is also relevant to the inquiry. *Skerski*, 257 F.3d at 281.

The plaintiff in *Deane* was a nurse who was unable to lift heavy weights because of a work related injury. The employer/hospital claimed that lifting heavy objects was an essential function of Deane's job as evidenced by the job description. That job description included "frequent lifting of patients" as one of the "major tasks, duties and responsibilities" of a nurse in Deane's position. *Deane,* 142 F.3d at 148. Deane admitted that lifting heavy objects, including patients, was a "critical job demand[ ]," and the hospital insisted that a "nurse's inability to lift patients" could create a dangerous situation for Deane's patients. *Id.*

Deane countered the hospital's claim of job necessity with a vocational expert who asserted that heavy lifting was not one of the "four critical tasks" for nurses under the Department of Labor's Dictionary of Occupational Titles Job Descriptions. 142 F.3d at 147. The expert drew a distinction between nurses who did not need to lift patients, and orderlies who did. The latter are classified as "heavy-duty labor." *Id.* The expert criticized the hospital's job description to the contrary for incorrectly characterizing the lifting requirements for nurses. Deane's expert insisted that nurses are required to lift much less frequently than the hospital's job description suggested. *Id.* Despite the intuitive appeal of the hospital's argument, we concluded that the factual question remained for the jury. *Id.* at 148.

The employer in *Skerski* also made an argument that had superficial appeal. There, plaintiff was employed by Time Warner to service cables, wires, and aerial cable plants Time Warner maintained as part of its cable television service. This required both climbing poles and working at heights. After approximately ten years on the job, Skerski was diagnosed with panic and anxiety disorder, and his doctor recommended that he stop climbing and working at heights. 257 F.3d at 276. Thereafter, Skerski asked his supervisor to provide him with a bucket truck so that he could continue working at heights, but the supervisor claimed that the company did not have any. *Id.*[10] The

---

10. There was some discrepancy about whether the company had a bucket truck or not. Skerski claimed the company had an old one that

employer did offer to retrain Skerski to allow him to "re-acquire the climbing skills necessary to continue his job as a technician," but the training program abruptly stopped without explanation after Skerski's doctor confirmed that Skerski's incapacitating anxiety prevented him from working at heights. *Id.* at 277. Skerski eventually accepted another position with the company at a significantly lower salary while expressing a desire to continue doing underground repair work as he had since the onset of his anxiety disorder. *Id.* Skerski subsequently injured his back and began receiving workers' compensation benefits, and thereafter filed suit under the ADA to recover money damages and reinstatement to his " 'modified duty status' as an installer technician." *Id.*

The district court granted Time Warner's motion for summary judgment even though it found a genuine issue of material fact as to whether Skerski was disabled and whether the alternative position he was offered constituted a reasonable accommodation under the ADA. *Id.* The court reasoned that "climbing was an essential function of the installer technician's job that Skerski could not perform . . . ." *Id.* Accordingly, the court held that Time Warner was entitled to judgment as a matter of law because Skerski was not "an otherwise qualified individual" under the ADA and therefore could not establish a *prima facie* case for disability discrimination. *Id.* We reversed.

After discussing the definition of "essential functions" set forth in 29 C.F.R. § 1630.2(N)(1), we stated:

> [t]he regulations list several factors for consideration in distinguishing the fundamental job functions from the marginal job functions, including: (1) whether the performance of the function is the reason the position exists; (2) whether there are a limited number of employees available among whom the performance of that job function can be distributed; and (3) whether

could have been made available to him, but his supervisor denied that. The supervisor also insisted that Skerski had to be "100%" to continue working at heights. 257 F.3d at 277.

the function is highly specialized so that the incumbent in the position is hired for his or her expertise.

257 F.3d at 279 (internal quotation marks omitted). We also noted the non-exhaustive list of examples of probative evidence set forth in the regulations. *Id.* That evidence includes:

(I) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the jobs; and/or

(vii) The current work experience of incumbents in similar jobs.

*Id.* (citing 29 C.F.R. § 1630.2(n)(3)).

After analyzing the evidence submitted by Skerski and Time Warner in context with the aforementioned regulations, we concluded that a genuine issue of material fact remained as to whether climbing was an essential job function for a cable installer. In doing so, we did not ignore Time Warner's claim that it was an essential function, nor the fact that the written job description identified climbing as a job requirement. However, neither did we ignore Skerski's testimony that his own experience suggested that he had been able to satisfactorily perform as a cable installer even though he had not been able to climb for three years. We reasoned: "consideration of the seven evidentiary examples included in § 1630.2(n)(3) suggests caution against any premature determination on essential functions as at least some of them lean in Skerski's favor." 257 F.3d at 280. Here, of course, MBNA's assertion that an 8:00 a.m. start time is an essential function of the job is

substantially weaker than Time Warner's position in *Skerski,* or the hospital's position in *Deane.*

Here, MBNA rests its claim of the importance of punctuality largely upon the need for its officers to set an example by coming to work "on time." It can hardly be seriously doubted that an employer has a right to expect its managerial employees to set an example for other employees. MBNA thus argues that "the responsibility of showing an example is an essential function." Appellee's Br. at 34. However, that argument can attach with equal force to any one of numerous aspects of a bank officer's job that an employer might justifiably want employees to emulate. It could include a requirement that male managers wear business suits and ties. Though such examples may be justifiable from the employer's point of view, even important to the professional atmosphere and decorum that is largely defined by the conduct of managers, that hardly elevates such preferences to fundamental functions. Absent more than appears on this record, we are not prepared to conclude that beginning work at 8:00 a.m. as opposed to 9:00 a.m. is an essential job function. That is especially true here as MBNA does not suggest that Conneen did not perform her job satisfactorily once she did arrive, or that MBNA's business was injured by the extra hour it gave her to report for work during the period of the accommodation.

MBNA cites *Earl v. Mervyns Inc.,* 207 F.3d 1361 (11th Cir. 2000) to support its assertion that setting an example can be an essential job function. However, there the employee was charged with opening a department in a small retail store. *Earl,* 207 F.3d at 1366. Obviously, customers will go elsewhere and sales will be lost if a retail establishment (especially one as small as the defendant in *Earl*) cannot open according to its posted hours. Accordingly, an employer in those circumstances may be able to establish that punctuality is essential to the employee's job.

However, Conneen's situation is in no way analogous to that. Nor are we persuaded that allowing flexibility in an officer's starting times "ignores the wishes of the employer and sends a message to all employees that starting work at

the prescribed time does not matter, as long as you get your work done," as MBNA argues. Appellee's Br. at 34.[11]

MBNA has every right to require its employees to start work "at the prescribed time." *Id.* That is not the issue here. Rather, the issue is whether MBNA can define an essential job function for an employee in a managerial position in an office setting with nothing more to substantiate the importance of that requirement than a desire that a manager set a good example. We can find nothing on this record beyond MBNA's own *ipse dixit* to suggest that Conneen's delayed starting time injured MBNA or interfered with Conneen doing her job.

MBNA's argument that it "explained to Conneen that because she was employed as an officer she was required to start work at 8:00 a.m," is relevant to our inquiry, but not determinative. Appellee's Br. at 35. "Describing [punctuality] as a requirement is not necessarily the same as denominating [punctuality] is an essential function." *Skerski*, 257 F.3d at 280.[12]

Although there clearly may be some situations where an employee's starting time cannot be altered because it is an essential function of the job, nothing on this record leads us to conclude that to be the case here. Accordingly, we hold that the district court erred in concluding that Conneen was not a "qualified individual" under the ADA because she could not perform an essential job function.

---

11. MBNA's insistence that managers arrive on time to set an example also ignores the rather obvious fact that Conneen would demonstrate punctuality as long as she consistently arrived at work promptly before her designated starting time even if the starting time was 9:00.

12. Ironically, Conneen concedes that punctuality and attendance are essential functions of any position of employment. She states that she "believe[s] that attendance and punctuality are essential functions of any position." *See* Appellant's Br. at 29. However, she claims that the issues here "do not involve attendance and punctuality." *Id.* In spite of this concession, Conneen goes on to argue that "changing of the work time by one hour was not an essential function for the position." *Id.* at 32. We interpret this to mean that she does not concede that it was essential for her to report at 8:00 as opposed to 9:00 a.m. insofar as an analysis of "essential job functions" under the ADA is concerned.

She presented sufficient evidence to establish that she was a qualified individual under the ADA despite her tardiness. Nevertheless, we hold that the district court correctly entered summary judgment in favor of MBNA and against Conneen because Conneen is responsible for the breakdown of the interactive process required under the ADA.

### 2. The Interactive Process

"The ADA itself does not refer to [an] 'interactive process.'" *Shapiro v. Township of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002). Rather, the text of the ADA requires only that an employer make a reasonable accommodation to the known physical or mental disability of a qualified person with a disability unless the employer can show that the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). However, applicable regulations provide that in order "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. § 1630, app. 1630.9 at 359.

In *Mengine v. Runyon*, we held that "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." 114 F.3d 415, 420.[13]

---

13. *Mengine* involved the interactive process implicated under the Rehabilitation Act, but the discussion applies with equal force to accommodations under the ADA. *See, Taylor v. Phoenixville School District*, 184 F.3d at 312, n.5.

In *Taylor v. Phoenixville Sch. Dist.,* we concluded that the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process. 184 F.3d 296, 319-20 (3d Cir. 1999). "[T]he purpose of the interactive process is to determine the appropriate accommodations: '[t]his process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.' " *Id.* at 316. "When the interactive process works well, it furthers the purposes of the . . . ADA." *Mengine,* 114 F.3d at 420. It may, in fact, not only lead to identifying a specific accommodation that will allow a disabled employee to continue to function as a dignified and valued employee, it may also help sensitize the employer to the needs and worth of the disabled person. It therefore furthers the interest of the employer, and the dignity and humanity of the disabled employee.

Here, MBNA and Conneen did engage in the interactive process as required under the ADA. However, not surprisingly, each side blames the other for the breakdown in that process. Conneen argues:

> Query: Which party was responsible for the breakdown in the interactive process? The facts are abundantly clear that the reasonable accommodation requested by Ms. Conneen had been granted and it was only through the unilateral actions of the employer that the accommodation was withdrawn from plaintiff. We submit that there is no other way to interpret these facts. The accommodation was there, it was agreed upon and there was medical support for same.

Appellant's Br. at 22.

MBNA argues:

> While the employer's duty to accommodate is a continuing one that is not exhausted by a single effort alone, the employee still needs to keep her employer current on her situation. Failure to accommodate claims are extinguished when, as here, the employee

fails to renew a request for an accommodation after problems resurface.

Appellee's Br. at 26. In *Taylor*, we stated that an employee who tries to hold his/her employer responsible for a breakdown in the interactive process under the ADA must show:

1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor*, 184 F.3d at 319-20. Here, MBNA concedes that it knew of Conneen's disability, and that Conneen initially requested an accommodation. However, MBNA claims that it had no reason to believe that the accommodation it initially provided was still necessary and that Conneen has no one other than herself to blame for that. MBNA argues:

Here, all evidence available to MBNA in June 1998 indicated that the alleged disability had ended. MBNA had returned Conneen to the normal 8 a.m. starting time and, after some false starts, she was warned, and proceeded to arrive on time for a month. When she was again tardy repeatedly and was asked for an explanation, she said nothing about a medical condition, even when asked if this was the problem. Under these circumstances, MBNA acted reasonably in concluding that no disability issue existed at the time.

Appellee's Br. at 25-26 (citations omitted). We agree.

Although an employer is liable for discriminating against an employee in need of accommodation based upon the employee's *known* disability, neither the law nor common sense can demand clairvoyance of an employer in MBNA's position. *See* 42 U.S.C. § 12112(b)(5)(A) (requiring only reasonable accommodations to known disability); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) (noting initial duty of employee to inform employer of disability is dictated by "common sense lest a disabled

employee keep his disability a secret and sue later for failure to accommodate.") Although MBNA clearly knew of Conneen's allegedly disabling morning sedation, it had every reason to believe that the condition no longer existed at the time of the June 1998 meeting, and Conneen did nothing to inform MBNA that it did. In fact, through words and deeds she confirmed and corroborated MBNA's conclusion that it did not.

We realize, of course, that there is a dispute of fact about the exact contents of the April 7 conversation Dr. Seltzer had with Nurse Peterson regarding the duration of Conneen's disability. However, given what is not disputed, that discrepancy does not rise to the level of a material fact. Dr. Seltzer's March 13, 1998 note to MBNA simply states that Conneen should be allowed to report at a later time without stating any medical basis for the request. All parties to this controversy, including Dr. Seltzer, viewed the accommodation of a later starting time as temporary. Moreover, even Dr. Seltzer agrees that Nurse Peterson's conclusion that the accommodation would only be necessary for two more weeks following her April 7 discussion with him was medically reasonable. More importantly, however, when Conneen was asked numerous times to explain her tardiness after the initial accommodation was terminated, she never once suggested a medical problem or medication interfered with arriving at 8:00 a.m. Rather, she assured MBNA that she could report at 8:00 a.m. and then blamed her failure to do so on traffic, giving her mother a ride, and her dog's gastric and/or urinary distress. Moreover, Conneen was given numerous chances after initially being warned on March 6, 1998, that any further tardiness would result in dismissal. Each warning was accompanied with an opportunity to offer an explanation that should have opened the door for Conneen to communicate about her morning sedation or involve Dr. Seltzer in the discussions.

We realize, of course, that someone with a disability may be reluctant to discuss it with anyone, particularly his/her employer. This is especially true where, as here, the underlying problem implicates one's mental or emotional stability. *See Taylor*, 184 F.3d at 315 (noting that

"[d]isabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records . . . the information may be irrelevant . . . and . . . could be embarrassing, and might actually exacerbate workplace prejudice."). However, that does not alter our analysis under these circumstances.

Although we can envision situations where an employee would be reluctant to admit to having a disability even if the employer already knows, Conneen had already given MBNA permission to speak with her psychiatrist, and she was aware that the appropriate personnel from MBNA had spoken to him. Moreover, nothing here suggests that the work environment was anything other than supportive of Conneen, and conducive to candid and sensitive discussion about the underlying cause of her tardiness. MBNA invited that communication numerous times, and we are less than persuaded by Conneen's attempt to charge MBNA for the fact that she declined the invitations and openings it afforded her.

The law does not require any formal mechanism or "magic words," to notify an employer such as MBNA that an employee needs an accommodation. *Taylor*, 184 F.3d at 313. Moreover, as the court noted in *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996), circumstances will sometimes require "[t]he employer . . . to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." However, either by direct communication or other appropriate means, the employee "must make clear that the [he/she] wants assistance for his or her disability." *Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000). The employer must have enough information to know of "both the disability and desire for an accommodation," *Taylor*, 184 F.3d at 313, or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation.

The quantum of information that will be required will, therefore, often depend on what the employer already

knows. *Taylor,* 184 F.3d at 313. However, nothing that MBNA knew here suggested that Conneen was still suffering from the effects of her medication. She told MBNA that she was not, and MBNA is not to be faulted for taking her at her word under these circumstances.[14]

Despite MBNA's prior knowledge of Conneen's morning sedation, the interactive process requires an employee in her position to do something more than proffer excuses of heavy traffic, giving a parent a ride, or cleaning up after a pet when asked to explain tardiness. This is especially true given the repeated warnings MBNA had given Conneen.[15]

After being given repeated chances and offering repeated assurances of punctuality, Conneen was on time for nearly a month before she was finally terminated. MBNA cannot be held liable for failing to read Conneen's tea leaves. Conneen had an obligation to truthfully communicate any need for an accommodation, or to have her doctor do so on her behalf if she was too embarrassed to respond to MBNA's many inquiries into any reason she may have had for continuing to be late.

As we have noted here and elsewhere many times, both the employer and the employee have a duty to act in good faith once the interactive process begins. *Taylor,* 184 F.3d at 312 (quoting *Mengine,* 114 F.3d 415, 419-20 (3d Cir. 1997)). "All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Id.* at 317.

14. *Cf. Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 163-64 (5th Cir. 1996) (where employee only asked employer to reduce workload, employee failed to provide evidence that employer knew of limitations arising out of disability); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d at 313-14 (employee's psychotic episode at work coupled with employer's plan to discuss situation with employee's doctor was sufficient to trigger employer's obligation to engage in interactive process).

15. It must be remembered that the pattern of tardiness here included Conneen's reporting for work late and inebriated on one occasion. Nothing suggests that her apparent inebriation was in any way related to her medication or that MBNA had reason to suspect a medical cause for that behavior.

The district court's analysis of MBNA's good faith is very instructive and merits quoting at length. The court stated:

> Although the court can understand her reluctance to share every detail of her illness, three factors weigh heavily against Conneen.

> First, [she] had previously requested—and was granted—accommodation on at least three occasions. Therefore, she knew what needed to be done in order receive accommodation. For example, in March 1998, when Conneen was told to provide medical documentation of her condition in order to be granted accommodation, she immediately contacted Dr. Seltzer and obtained a medical excuse. However, once MBNA threatened to withdraw the accommodation, Conneen remained silent. Conneen never contacted Dr. Seltzer, and never notified the MBNA health staff of her condition. Although Conneen argues that she relied on Nurse Peterson's statements regarding Dr. Seltzer's opinion, the record fails to reveal any explanation as to why—if Conneen disagreed with these purported statements—she did not immediately contact Dr. Seltzer for clarification. . . . [Conneen] cannot reasonably expect that MBNA was required to obtain the medical information necessary for her accommodation on its own volition.

> The second factor that weighs against Conneen is the fact that all parties—including Dr. Seltzer—understood that the initial accommodation was temporary. Conneen was thus on notice that at some point in time, if her problems continued, she would have to go back to MBNA and provide further documentation. Nevertheless, she failed to take the steps necessary to notify MBNA that she required further assistance.

> The final factor that causes the court to find that Conneen was the party that acted in bad faith is the fact that not only did she fail to communicate, she affirmatively misrepresented her situation, thus thwarting MBNA's attempts to learn about her condition. . . .

*Conneen*, 182 F. Supp. 2d at 380 (citations omitted). The court also noted the following undisputed evidence supported MBNA's good faith:

> First, when Conneen presented documentation to MBNA in March 1998, she was immediately accommodated. Second, MBNA did not withdraw any accommodations without Conneen's knowledge or consent. For example, MBNA only terminated Conneen's accommodation in February 1998 after she assured her supervisors that she was able to report on time. Third, even after the accommodations were withdrawn, MBNA always provided Conneen with time to adjust, rather than making the changes effective immediately. Fourth and most important, MBNA's supervisory and medical staff met with Conneen on multiple occasions in an attempt to encourage her to discuss any medical reasons for her tardiness. The defendant even offered her another position with a schedule more conducive to her needs.

*Id.* (citations omitted). Finally, the district court concluded that "MBNA acted with patience and prudence in this situation, given the information available to it at the time." *Id.* at 381. We agree. On this record, we can confidently conclude as a matter of law that MBNA made a good faith effort to engage in the interactive process and assist Conneen with her frequent tardiness, and no reasonable juror could conclude otherwise.

## B. The Implied Covenant of Good Faith and Fair Dealing

Next, Conneen alleges that MBNA breached its implied covenant of good faith and fair dealing under Delaware law. Delaware courts have been reluctant to recognize a broad application of this covenant out of concern that the implied covenant of good faith and fair dealing could swallow the doctrine of employment at will. *E.I. Dupont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996). While employment at will remains a strong presumption, the Delaware Supreme Court has recognized the limited application of the covenant to an at-will employment

contract. *Id.* at 440 (citing *Merrill v. Crothall-American, Inc.*, 606 A.2d 96 (Del. Super. Ct. 1992)).

Accordingly, Delaware law recognizes four situations where a breach of the implied covenant of good faith and fair dealing may occur in an at-will employment situation:

> (I) where the termination violated public policy;

> (ii) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one;

> (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and

> (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder,* 748 A.2d 393, 400 (Del. 2000) (citing *Pressman,* 679 A.2d at 442-44). Conneen alleges that MBNA breached its implied covenant of good faith and fair dealing on grounds (I), (ii), and (iv) above. Appellant's Br. at 34-6.

Given the preceding discussion of Conneen's responsibility for the breakdown in the interactive process, and MBNA's good faith, we need not even respond to her attempt to rely upon grounds (I) or (ii), and we need only offer brief discussion of her attempt to establish liability under ground (iv). That latter claim rests upon Conneen's allegation that "Nurse Peterson falsely stated the opinion of Dr. Seltzer with regard to plaintiff's prospective change in her work schedule." Appellant's Br. at 36. She insists that Dr. Seltzer never told Nurse Peterson that she could resume her normal work schedule at 8:00 a.m. However, even if we assume that Dr. Seltzer did not specifically tell Nurse Peterson that Conneen could begin reporting to work at 8:00 a.m., it is clear from Dr. Seltzer's own testimony that Conneen can establish, at best, a misunderstanding on the part of Nurse Peterson regarding the April 7 conversation. Moreover, given Dr. Seltzer's further testimony that Nurse Peterson's conclusion was not unreasonable, Conneen

cannot elevate that misunderstanding into a deliberate attempt to falsify records even under the deferential summary judgment standard that we must apply to that "dispute." As noted above, no one from MBNA contacted Dr. Seltzer without Conneen's prior consent, and the record does not support Conneen's attempts to impute nefarious motives to Nurse Peterson or anyone else at MBNA.[16]

## IV. CONCLUSION

For the reasons set forth above, we will affirm the district court's grant of summary judgment in favor of MBNA America Bank.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

16. We do not reach Conneen's claim that MBNA is collaterally estopped from litigating the precise contents of Dr. Seltzer's April 7 conversation with Nurse Peterson because we agree with the district court's conclusion that it is irrelevant. Even if we view that conversation in the light most favorable to Conneen, as we must when reviewing summary judgment, we would still be left with Conneen's failure to engage in the interactive process for months after that conversation. Moreover, despite Conneen's view of that conversation, it is undisputed that Dr. Seltzer testified that Nurse Peterson's recollection of the conversation was not unreasonable. This combined with the information that Dr. Seltzer had initially put on Conneen's disability form clearly supports MBNA's conclusion that Conneen's disability was a temporary reaction to medication. In fact, Dr. Seltzer's testimony is not to the contrary. Thus, the dispute about the content of the April conversation is hardly fatal to MBNA's summary judgment.